UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

| | | |
|---|---|---|
| SPS LIMITED PARTNERSHIP, LLLP<br>600 Shipyard Road<br>Baltimore, MD  21202 | \* | |
| | \* | |
| and | | |
| | \* | |
| SPS 35, LLC<br>600 Shipyard Road<br>Baltimore, MD 21202, | \* | Civil Action No.:  1:14-cv-00589 |
| Plaintiffs, | \* | |
| v. | | |
| SPARROWS POINT, LLC<br>1650 Des Peres Road, Suite 303<br>St. Louis, MO  63131 | \* | |
| | \* | |
| SERVE ON RESIDENT AGENT:<br>c/o National Registered Agents, Inc.<br>  of Maryland<br>351 W. Camden Street<br>Baltimore, MD 21201 | \*<br><br>\* | |
| SPARROWS POINT TERMINAL, LLC<br>7901 Parkway Drive<br>Hanover, MD 21076 | \*<br><br>\* | |
| SERVE ON RESIDENT AGENT:<br>CSC-Lawyers Incorporating Service Co.<br>7 St. Paul Street, Suite 820<br>Baltimore, MD  21202 | \*<br><br>\* | |
| Defendants. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**SECOND AMENDED COMPLAINT**

SPS Limited Partnership, LLLP and SPS 35, LLC ("Plaintiffs"), by and through their counsel, Gordon Feinblatt LLC, file this Second Amended Complaint and allege as follows:

**I.     NATURE OF CASE**

1.     This is an action to recover for environmental costs caused by ongoing and continuous discharges of pollutants by Defendants onto Plaintiffs' property.  Defendants, who acquired the Sparrows Steel Mill Site ("the Steel Mill Site") in 2014 and/or 2012, are the latest in a long line of owners/operators of the Steel Mill Site who have failed to remedy harm caused by the discharges. Plaintiffs bring this Complaint to 1) recover cleanup and other response costs incurred by Plaintiffs or their affiliates; 2) to obtain contribution from the above-named Defendants; 3) to obtain declaratory relief as to liability for future response costs pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA"), 42 U.S.C. §§ 9607(a); and 4) to recover damages pursuant to Maryland common law.

2.     The subject matter of this action is the Sparrows Point Shipyard located in Sparrows Point, Baltimore County, Maryland ("the Shipyard Site").  The Shipyard Site, which has an address of 600 Shipyard Road, Sparrows Point, Baltimore County, Maryland, is identified as "PARCEL SY AREA = 226.3575 ACRES" on the plan of survey prepared by Whitman, Requardt and Associates entitled "Subdivision Plat of Part of the Property of Bethlehem Steel Corporation" dated May 28, 1997, and recorded among the Land Records of Baltimore County, Maryland in Liber 69, Folio 87.

3.     The Shipyard Site is adjacent to and surrounded on three sides by certain real property consisting of approximately 3500 acres located on or adjacent to North Point Boulevard, Sparrows Point, Baltimore County, Maryland, upon which a steel mill has operated for over 100 years (the "Steel

Mill Site").

4.  Defendants are present and/or former owners and operators of the steel manufacturing and related facilities located on the Steel Mill Site where the violations that are the subject of this Complaint took place and continue to take place. Defendants are successor owners and operators to ISG Severstal Steel ("ISG") and RG Steel Sparrows Point, LLC, and to Bethlehem Steel Corporation ("BSC"), the original owner and operator of the Steel Mill Site. Although Plaintiffs previously resolved a lawsuit against ISG and its parent company ArcelorMittal USA, Inc. for past discharges, Defendants are now the owners and operators of the site and are thus liable for the damages suffered by Plaintiffs.

## II.  JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction based upon CERCLA, 42 U.S.C. §§ 9607 and 9613; RCRA, 42 U.S.C. § 6972; the existence of a federal question, 28 U.S.C. § 1331; and there being diversity of citizenship among the parties and the amount in controversy exceeding $75,000.00, 28 U.S.C. § 1332. This Court has supplemental jurisdiction over the state law claims based on 28 U.S.C. § 1367, said claims being so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

6.  Additionally, this Court has authority to issue a declaratory judgment concerning the rights and liabilities of the parties pursuant to 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. § 9613(g)(2).

7.  Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1395, 42 U.S.C. §§ 9607(a), and 42 U.S.C. § 6972(a)(1)(B) because the releases or threatened releases of hazardous substances, the acts and omissions of Defendants, and the damages incurred and to be incurred by Plaintiffs giving rise to the claims in this action occurred in this district, because the Shipyard Site is located in this district, and because the alleged endangerment occurred and is occurring

in this district.

8. On or about September 5, 2008, Plaintiffs and Defendants' predecessors-in-interest, Arcelor Mittal USA LLC ("Arcelor Mittal") and ISG entered into a Tolling Agreement which tolled and suspended any limitations periods set forth in any applicable statute of limitations or statutes or periods of repose applicable to any claims Plaintiffs possessed against Defendants as of August 28, 2008.

9. On or about September 10, 2013 Plaintiffs resolved a prior lawsuit in this Court against Arcelor Mittal for the illegal discharges. Plaintiffs' resolution of this prior matter does not bar Plaintiffs' current claims against the present Defendants.

10. On or about October 17, 2014 and/or December 18, 2013, Plaintiffs provided written notice of their intent to bring this action, as required by 7002(b)(2)(A), 42 U.S.C. § 6972(b)(2)(A), and § 310(d)(1) of CERCLA, 42 U.S.C. § 9659(d)(1). More than 60 days have passed since the notices were given and neither the United State Environmental Protection Agency ("USEPA") nor the Maryland Department of Environment ("MDE") has commenced or is diligently prosecuting a civil or criminal action to redress the violations. In addition, USEPA has not taken any of the actions described in section 7002(b)(2)(B)(i)-(iv) of RCRA, 42 U.S.C. § 6972(b)(2)(B)(i)-(iv), and MDE has not taken any of the actions described in section 7002(b)(2)(C)(i)-(iii) of RCRA, 42 U.S.C.§ 6972(b)(2)(C)(i)-(iii).

**III.   PARTIES**

11. Plaintiff SPS Limited Partnership, LLLP ("SPS LLLP") is a Maryland limited liability limited partnership with its principal place of business located at 600 Shipyard Road, Baltimore, Maryland in Baltimore County 21219.

12. Plaintiff SPS 35, LLC ("SPS 35") is a Maryland limited liability company with its principal place of business located at 600 Shipyard Road, Baltimore, Maryland in Baltimore County

- 4 -

21219.

13.     Defendant Sparrow Point Terminal, LLC ("SPT") is a Maryland limited liability company with its principal place of business at 7901 Parkway Drive, Hanover, Maryland 21076.

14.     Defendant Sparrows Point, LLC (Sparrows Point") is a Maryland Limited Liability Company with its principal place of business at 1650 Des Peres Road, Suite 303, St. Louis, MO 63131.

15.     ISG Sparrows Point, LLC ("ISG") acquired the Steel Mill Site from BSC on or about April 30, 2003. On or about April 5, 2005, Mittal Steel USA, Inc. acquired the site from ISG. Arcelor Mittal acquired the site when it merged with Mittal Steel on or about June 20, 2006.

16.     In 2012, Sparrows Point acquired the Steel Mill Site in a bankruptcy proceeding for RG Steel's parent company. SPT acquired the Steel Mill Site in 2014, after this action was filed.

17.     On information and belief, Defendants currently jointly own and/or operate the Steel Mill Site, individually or collectively have done so in the past. In doing so, Defendants are responsible for complying with all environmental laws pertaining to the operation and ownership of the Steel Mill Site, including current and past pollution emanating from the Steel Mill Site.

**IV.    FACTUAL BACKGROUND**

18.     SPS LLLP is the current majority owner of the Shipyard Site. SPS LLLP acquired title to the Shipyard Site on or about March 4, 2004 from Baltimore Marine Industries, Inc. SPS 35, LLC acquired a minority ownership interest in the Shipyard Site on or about June 8, 2006.

19.     The Shipyard Site was developed as a shipyard in approximately 1880. The Shipyard Site is comprised of approximately 131.5 acres of dry land; a 13.4 acre excavated shore dry dock for ship maintenance, repair and construction (the "Graving Dock"); and Operations at the Shipyard Site have included the repair, modification, dismantling and construction of ships. Activities in support of

those operations have included metal machining, metal fabrication, grit blasting, painting, electrical repair, heat treatment of sheet metal and ship breaking.  The Graving Dock, which was constructed in approximately 1969, is flooded in order to bring ships into the dock, and then can be pumped dry to facilitate repair, maintenance or construction work on ships.

20. Based on information and belief, operations at the Steel Mill Site have included, among other things, a rod mill, hot strip mills, a cold sheet mill, rolling plate mill, tin mill, pipe mill, coke ovens and by-products recovery systems.

21. On or about February 25, 1997, the United States filed a complaint against BSC, the former owner and operator of the Steel Mill Site, alleging that BSC was operating without permits required under RCRA.  On or about February 25, 1997, the State of Maryland also filed a complaint against BSC, pursuant to its authority under state environmental laws, seeking relief from alleged endangerment to human health and the environment from contamination at and around the Steel Mill Site.  Both the USEPA and the MDE have determined that operations at the Steel Mill Site have caused a release of hazardous wastes, hazardous substances and/or hazardous constituents into the environment at and/or from the Steel Mill Site.

22. On October 8, 1997, BCS entered into a consent decree (the "Consent Decree") with the USEPA and the MDE pursuant to RCRA (USEPA File/Site Number MDD053945432).  Pursuant to the Consent Decree, BSC agreed to investigate and address certain environmental conditions at the Steel Mill Site and the Shipyard Site.  Effective April 30, 2003, the Consent Decree was modified to replace BSC with ISG as the party responsible for complying with the Consent Decree.

23. On or about June 15, 2006, the Shipyard Site was removed from the Consent Decree pursuant to the approval and direction of the USEPA.

24. Based on information and belief, operations at the Steel Mill Site have resulted in releases of hazardous substances at the Steel Mill Site, including benzene, which releases have caused and are causing contamination of soil and/or groundwater at the Steel Mill Site. Contamination in the soil and groundwater at the Steel Mill Site has migrated and is migrating to the Shipyard Site.

25. Based on information and belief, operation of the coke ovens and facilities associated with the coke ovens (including, without limitation, the structure known as the "litol/benzene plant") at the Steel Mill Site has resulted in releases of hazardous substances (including, without limitation, benzene, naphthalene, toluene, ethylbenzene, xylenes, other organic substances, and arsenic, lead and other metals) to the soil and groundwater at the Steel Mill Site, which hazardous substances have migrated, and are migrating, to the Shipyard Site.

26. Based on environmental investigations performed on behalf of ISG at the Steel Mill Site, the area of the coke oven operations is one of five RCRA highly-contaminated areas (identified in the investigations as "Special Study Areas" by EPA) at the Steel Mill Site.

27. According to ISG's environmental investigations, the area of the coke oven operations is the "source area" of contamination, including without limitation, benzene, naphthalene, toluene, ethylbenzene, xylenes, other organic substances, and arsenic, lead and other metals.

28. According to ISG's environmental investigations at the Steel Mill Site, concentrations of benzene in the groundwater beneath the area of the coke ovens are as high as 1,100,000 micrograms per liter.

29. Water and sediment samples collected by the Maryland Port Administration in 2009 confirm that the hydrocarbon plume created by the Steel Mill Site has migrated into the Patapsco River.

30. Based on information and belief, none of the Defendants, neither USEPA nor MDE has

taken sufficient action to control, mitigate, prevent, abate, remediate or remove the groundwater and soil contamination associated with the area of the coke oven operations.

31. Plaintiffs have investigated and are continuing to investigate environmental conditions at the Shipyard Site (including the nature, scope and cause(s) of groundwater contamination at the Shipyard Site) pursuant to requirements of the State of Maryland. To date, Plaintiffs have incurred in excess of $700,000 to investigate environmental conditions at the Shipyard Site.

32. When Plaintiffs acquired the Shipyard Site, they inherited an NPDES permit that had been in draft form for a number of years. The NPDES permit included a benzene limit associated with the dewatering/trim pumps at the Graving Dock (i.e., pumps that pump out the water that is in the Graving Dock, which comes from the Patapsco River when the gate is open for a vessel to enter or exit the Graving Dock).

33. In 2007, MDE realized that the benzene requirement in the NPDES permit should have been associated with the underdrain pumps, rather than the dewatering/trim pumps, and asked Plaintiffs to sample for benzene at the underdrain pumps.

34. During 2008, Plaintiffs and MDE discussed revision of the NPDES permit and the need for Plaintiffs to have time to install a treatment system for the benzene.

35. In January 2009, Plaintiffs and MDE finalized a revised NPDES permit with a new benzene requirement at the underdrain pumps to become effective on February 1, 2010.

36. Plaintiffs have had to install a wastewater treatment system designed to remove benzene at the Graving Dock in order to comply with the NPDES permit.

37. Despite the requirements of the 2003 Consent Decree, Defendants are no further along in remediating the continuous, ongoing discharges from the Steel Mill Site than their predecessors. More

than a decade has passed since entry of the Consent Decree, and the discharges continue to flow onto the Shipyard Site.  Defendants thus have failed to remediate the environmental problems at the Steel Mill Site as required by the Consent Decree, and as required by applicable law.

38.   To date, the cost of installing and operating the wastewater treatment system has amounted to more than $700,000 and is expected to cost an additional $20,000 per month in operating and maintenance costs.

## COUNT ONE
## COST RECOVERY UNDER CERCLA

39.   The allegations of paragraphs 1 through 38 inclusive of this Complaint are hereby incorporated by reference as if fully set forth herein.

40.   Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) states:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section --
>
> (1) the owner or operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
>
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or Sites selected by such person, from which there is a release or threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for --
>
> (A) all costs of removal or remedial action incurred by the United

- 9 -

> States Government or a State . . . not inconsistent with the National Contingency Plan;
>
> (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan . . .

41. Defendants are "persons" within the meaning of section 101(21) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601(21).

42. "Hazardous substances" within the meaning of section 101(14) of CERCLA, 42 U.S.C. § 9601(14), including benzene were disposed, placed or otherwise became located at the Steel Mill Site at times relevant to this action.

43. There have been "releases" within the meaning of section 101(22) of CERCLA, 42 U.S.C. § 9601(22), or threatened releases, of hazardous substances into the environment at or from the Steel Mill Site at times relevant to this action.

44. The Steel Mill Site is a "facility" within the meaning of section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

45. Upon information and belief, Defendants are liable persons pursuant to section 107(a)(1) or 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(1) or § 9607(a)(2), in that they are a present owner and/or operator of part of the Steel Mill Site, or a former owner and/or operator of the Steel Mill Site at a time when hazardous substances were disposed at the Steel Mill Site.

46. Such "disposal" constitutes a "release" or "threatened release" within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

47. The investigation and actions taken by Plaintiffs in connection with the Shipyard Site constitute "response" actions within the meaning of section 101(25) of CERCLA, 42 U.S.C. § 9601(25), in connection with which Plaintiffs have incurred costs necessary and consistent with the National

3203846.2 37195/124461 01/05/2015

Contingency Plan ("NCP") which was promulgated under section 105(a) of CERCLA, 42 U.S.C. § 9605(a), and is codified at 40 C.F.R. part 300, et seq.

48. Plaintiffs have incurred and will continue to incur necessary response costs pursuant to section 107(a)(4)(B) of CERCLA, 42 U.SC. § 9607(a)(4)(B) and implementing regulations.

49. Defendants are jointly and severally liable to Plaintiffs for Plaintiffs' response costs, pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Defendants, jointly and severally, for all response costs incurred and to be incurred by Plaintiffs, that a declaratory judgment be entered against Defendants, jointly and severally, on liability for response costs that will be binding on any subsequent action or actions to recover further response costs, and that the Court award Plaintiffs their costs of suit, including costs of enforcement activities such as attorneys' fees, expert witness fees, interest, and such other and further relief as the Court shall deem just and proper.

### COUNT TWO
### DECLARATORY JUDGMENT

50. The allegations of paragraphs 1 through 49 inclusive of this Complaint are hereby incorporated by reference as if fully set forth herein.

51. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 and CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), Plaintiffs are entitled to a declaratory judgment holding Defendants liable for their equitable shares of all response costs incurred by Plaintiffs, in the past or future, in connection with the Shipyard Site.

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against Defendants (a) ordering Defendants to reimburse Plaintiffs for their equitable share, as determined by the Court, of response costs under 42 U.S.C. § 9607(a) which Plaintiffs have incurred or may incur in

the future in connection with the Shipyard Site; (b) ordering a declaratory judgment that Defendants shall be liable under 42 U.S.C. § 9607(a) for their equitable share of response costs, as determined by the Court, which Plaintiffs have incurred or may incur in the future in connection with the Shipyard Site; awarding Plaintiffs their costs and attorneys' fees and all other relief that the Court deems appropriate.

## COUNT THREE
## NEGLIGENCE

52. The allegations of paragraphs 1 through 51 inclusive of this Complaint are hereby incorporated by reference as if fully set forth herein.

53. Pursuant to State and Federal statutory and State common law, Defendants owe and owed Plaintiffs a duty of care in the generation, handling, disposal and containment of hazardous substances generated as a result of operations at the Steel Mill Site, including previous operation of the coke ovens and the facilities associated with the coke ovens.

54. Defendants, as current or former owners of the Steel Mill Site and/or as owner and/or operator of the steel mill, owed and continue to owe a duty of care to Plaintiffs and Plaintiffs' predecessor in title to ensure that reasonable measures would be taken to safely handle, store and dispose of the hazardous by-products of those processes, to prevent the migration and continuing migration of contaminants from the Steel Mill Site onto and into the Shipyard Site, and to remedy the problems they caused.

55. Defendants knew or should have known that operation of the coke ovens and associated facilities resulted in the disposal of hazardous substances at the Steel Mill Site, and that such disposal caused and is causing releases to the environment that present a serious risk of injury to persons or property, including Plaintiffs and the Shipyard Site.

56. Defendants knew or should have known that hazardous substances present in the

- 12 -

subsurface at the Steel Mill Site had migrated and were continuing to migrate onto and into adjoining properties, including the Shipyard Site.

57.     Defendants breached the duty of care owed to Plaintiffs and others by failing to act properly and reasonably to contain hazardous substances at the Steel Mill Site, to prevent the discharge of hazardous substances from the Steel Mill Site onto the Shipyard Site, and to promptly and appropriately remedy the problems they caused, including preventing the migration of contaminants onto and into the Property.

58.     Defendants' negligent acts also include, without limitation, the following:

    a.     improperly maintaining the Steel Mill Site;

    b.     failing to monitor, test and maintain systems for the detection of hazardous substances in the subsurface at the Steel Mill Site;

    c.     failing to safely handle, store and dispose of hazardous substances at the Steel Mill Site;

    d.     failing to notify promptly Plaintiffs and/or appropriate governmental authorities of the release(s) of benzene and other hazardous substances at the Steel Mill Site;

    e.     failing to determine promptly the scope of the release(s) of hazardous substances at the Steel Mill Site, including without limitation, the lateral extent and depth of contamination in the area of the coke oven operations;

    f.     failing to delineate fully the extent and nature of known groundwater contamination plumes originating at the Steel Mill Site (including without limitation, the groundwater contaminant plume emanating from the area of the coke oven operations) as required by Maryland statutes and regulations;

g. failing to control the movement of hazardous substances from the Steel Mill Site into the environment and/or to areas outside of the Steel Mill Site;

h. failing to contain hazardous substances present in the subsurface at the Steel Mill Site to the boundaries of the Steel Mill Site;

i. failing to address and remediate timely and adequately release(s) of hazardous substances at the Steel Mill Site, including preventing migration to other properties, including the Shipyard Site; and

j. committing any and all of the foregoing acts and omissions and thereby subjecting Plaintiff and others to a substantially increased risk of harm.

59. As a direct and proximate result of Defendants' conduct, Defendants have caused Plaintiffs to suffer and to continue to suffer financial and economic loss and loss of the use and enjoyment of the Property, as well as other damages. In light of the risks and dangers that were known or should have been known by Defendants to exist at the time, Defendants' conduct in allowing releases of benzene and other hazardous substances and, after the discovery of such contamination, failing to promptly and adequately investigate, remediate, and notify Plaintiffs and/or appropriate governmental authorities of the contamination, was without legal justification or excuse.

WHEREFORE, Plaintiffs pray that the Court enter judgment against Defendants and award Plaintiffs compensatory damages in an amount to be determined at trial, together with such other and further relief as the Court deems appropriate.

3203846.2 37195/124461 01/05/2015

## COUNT FOUR
## <u>TRESPASS</u>

60. The allegations of paragraphs 1 through 59 inclusive of this Complaint are hereby incorporated by reference as if fully set forth herein.

61. Defendants have allowed benzene and other hazardous substances to migrate from the Steel Mill Site to the Shipyard Site.

62. Defendants' unreasonable failure to contain benzene and other hazardous substances within the confines of the Steel Mill Site substantially and unreasonably interferes with Plaintiffs' reasonable use and enjoyment of the Shipyard Site.

63. The physical entry of the aforesaid substances onto the Shipyard Site interferes with Plaintiffs' possession, use and enjoyment of the Shipyard Site, is unlawful and without Plaintiffs' consent.

64. As a result of the migration of benzene and other hazardous substances from the Steel Mill Site onto Plaintiffs' property, the value of the Shipyard Site has been diminished in an amount to be determined at trial and Plaintiffs incurred and will continue to incur costs remediating and decontaminating the Shipyard Site in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against the Defendants for all costs incurred by Plaintiffs in remediating and decontaminating the Shipyard Site, together with the diminution in value of the Shipyard Site arising as a result of the contamination in an amount to be determined at trial, and such other and further relief as the Court deems appropriate.

3203846.2 37195/124461 01/05/2015

## COUNT FIVE
## NUISANCE

65.     The allegations of paragraphs 1 through 64 inclusive of this Complaint are hereby incorporated by reference as if fully set forth herein

66.     Defendants' unreasonable failure to contain benzene and other hazardous substances within the confines of the Steel Mill Site substantially and unreasonably interferes with Plaintiffs' reasonable use and enjoyment of the Shipyard Site.

67.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered injury insofar as they have been required to incur substantial expense remediating and decontaminating the Shipyard Site, loss of the use and enjoyment of the Shipyard Site and other damages.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Defendants for (a) all costs incurred and to be incurred by Plaintiffs in remediating and decontaminating the Shipyard Site, and (b) the diminution in value of the Shipyard Site arising as a result of the contamination in an amount to be determined at trial; and that Defendants be required to abate the migration of benzene and other hazardous substances from the Steel Mill Site to the Shipyard Site; and such other and further relief as the Court deems appropriate.

## COUNT SIX
## STRICT LIABILITY

68.     The allegations of paragraphs 1 through 67 inclusive of this Complaint are hereby incorporated by reference as if fully set forth herein

69.     Defendants' storage of hazardous materials underground at the Steel Mill Site without containment constitutes an abnormally dangerous activity, with a high risk of harm to Plaintiffs and the Shipyard Site.

3203846.2 37195/124461 01/05/2015

70. The risk of harm resulting from the failure to remediate and/or contain benzene and other hazardous materials is substantial.

71. Given the topography, the proximity of the coke ovens and associated operations to subsurface aquifers, and the close proximity of the Steel Mill Site to the Patapsco River, Defendants' subsurface, uncontained, and nonpermitted storage of hazardous substances at the Steel Mill Site is inappropriate for its locale.

72. Subsurface, uncontained and nonpermitted storage of hazardous substances is not a matter of common usage and the value of such activity was and is outweighed by the substance's dangerous propensity.

73. Defendants had the right to control and did control the operations on the Steel Mill Site.

74. As a result of the subsurface and uncontained storage of hazardous materials on the Steel Mill Site, the Shipyard Site was contaminated with benzene and other hazardous substances.

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and against Defendants for all costs incurred by Plaintiffs in remediating and decontaminating the Shipyard Site, together with the diminution in value of the Shipyard Site arising as a result of the contamination in an amount to be determined at trial, and such other and further relief as the Court deems appropriate.

3203846.2 37195/124461 01/05/2015

## **DEMAND FOR JURY**

Plaintiffs hereby demand a trial by jury on all issues triable to a jury.

/s/
George F. Ritchie, Bar No. 22408
Margaret M. Witherup (Bar No. 23730
Gordon Feinblatt LLC
The Garrett Building
233 East Redwood Street
Baltimore, Maryland  21202
410-576-4131
FAX:  410-576-4269
gritchie@gfrlaw.com
mwitherup@gfrlaw.com

Attorney for Plaintiffs
   SPS Limited Partnership, LLP and
   SPS 35, LLC