# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| SPS LIMITED PARTNERSHIP LLLP, and SPS 35, LLC | * | |
| v. | * | |
| SPARROWS POINT, LLC and TRADEPOINT ATLANTIC, LLC., *et al.*, | * | Civil No. JFM-14-589 |
| v. | * | |
| BWI SPARROWS POINT, LLC | * | |

\*\*\*\*\*\*

## MEMORANDUM

Plaintiffs SPS Limited Partnership LLLP, and SPS 35, LLC (collectively the "Shipyard Plaintiffs"), bring this lawsuit against defendants Sparrow Point, LLC, and Tradepoint Atlantic, LLC (f/k/a Sparrow Point Terminal, LLC) (collectively the "Steel Mill Defendants"), seeking recovery under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq*, and four Maryland common law claims—negligence, trespass, nuisance, and strict liability. The Shipyard Plaintiffs allege that the Steel Mill Defendants have caused an "ongoing and continuous discharge of pollutants" from their Steel Mill Property onto Plaintiffs' "Shipyard Site" in Sparrows Point, Maryland. The Steel Mill Defendants also filed counterclaims pursuant to CERCLA and Maryland law against the Shipyard Plaintiffs. Now pending is the Steel Mill Defendants' Motion for Summary Judgment [ECF No. 103], and the Shipyard Plaintiffs' Counter-Motion for Summary Judgment. [ECF No. 111]. Also pending is Tradepoint Atlantic's Motion for Summary Judgment on the sole issue of its status as a bona fide prospective purchaser [ECF No. 107], and the Steel Mill Defendants'

1

Motion to Strike the affidavit of Dr. Peter Shanahan. [ECF No. 128]. All motions are fully briefed, and no oral argument is necessary. *See* Local Rule 105.6. For the reasons set forth below, the Steel Mill Defendants' Motion for Summary Judgment [ECF No. 103] is granted, and the Shipyard Plaintiffs' Counter-Motion for Summary Judgment [ECF No. 111] is denied. Tradepoint Atlantic's Motion for Summary Judgment on the sole issue of its status as a bona fide prospective purchaser [ECF No. 107] is granted, and the Steel Mill Defendants' Motion to Strike the belatedly-introduced affidavit of Dr. Peter Shanahan is denied. [ECF No. 128].

## BACKGROUND

The uncontested facts are as follows. This dispute involves the alleged continuous flow of hazardous chemicals from the Steel Mill Property onto the adjacent parcel of land referred to as the Shipyard site. [ECF No. 69, p. 1]. Plaintiffs SPS LLLP and SPS 35 ("SPS") are the current owners of the former Bethlehem Steel Corporation Shipyard facility (the "Shipyard"), once part of the former Bethlehem Steel Mill ("Steel Mill Property") in Baltimore, Maryland. [ECF No. 105, p. 2; ECF No. 112, p.4]. Plaintiff SPS LLLP acquired the Shipyard in March 2004 from an entity called Baltimore Marine Industries, Inc. ("BMI"), and then sold a 35% ownership share to plaintiff SPS 35 in June 2006. [ECF No. 105, p. 2; ECF No. 112, p.4]. Operation of the Shipyard has been conducted by Third Party Defendant, BWI Sparrows Point, LLC ("BWI"), which is a related entity that has common ownership with SPS LLLP and SPS 35. [ECF No. 105, p. 2; ECF No. 112, p.4]. Collectively, plaintiffs will be referred to as "Plaintiffs," or the "Shipyard Plaintiffs."

A series of different corporations owned the Steel Mill Property between March 2004, when Plaintiff SPS purchased the Shipyard, and September 2012, when Defendant Sparrows Point, LLC ("Sparrows Point") purchased the Steel Mill Property. Sparrows Point acquired the

2

Steel Mill Property via an order under § 363 of the Bankruptcy Code that authorized Sparrows Point to acquire the property without assuming liability for any environmental contamination that may have migrated from the Steel Mill Property prior to that date. [ECF No. 105, p. 5-6]. In September 2014, Defendant Sparrows Point sold the Steel Mill Property to co-defendant Tradepoint Atlantic ("TPA"). Collectively, defendants will be referred to as "Defendants," or the "Steel Mill Defendants."

In February 1997, the Environmental Protection Agency ("EPA") and the Maryland Department of the Environment ("MDE") sued Bethlehem Steel Corporation—the former owner of both the Steel Mill and the Shipyard—for violating federal and state environmental law by causing "a release of hazardous wastes . . . substances and/or . . . constituents into the environment at and/or from the Steel Mill Site" including benzene, naphthalene, toluene, arsenic and lead. [ECF No. 69, p. 2]. This contamination was primarily the result of "coke oven operations" and "byproduct recovery operations" that had ceased in the 1980's. [ECF No. 105, p. 14-15 & Ex. 8]. Bethlehem Steel Corporation entered into a Consent Decree with the EPA and MDE on October 8, 1997, under which it "agreed to investigate and address certain environmental conditions at the Steel Mill Property and the Shipyard Site." [Id.] The EPA removed the Shipyard site from the consent decree in June 2006, but the Steel Mill Property remains bound by it. [Id.]

The Plaintiffs' Shipyard contains a "graving dock," which is used for the "repair or scrapping of ships under dry conditions." [ECF No. 112, p. 3]. Ships enter the graving dock when it is inundated with water, via the Patapsco River, and then the gate is closed and water is pumped out. [ECF No. 112, p. 3]. The central feature of the graving dock at issue in this case is the "underdrain pumping system." [ECF No. 105, p. 3]. This "underdrain pumping system"

3

collects groundwater and then pumps the water via pipes into the Patapsco River. [ECF No. 105, p. 3]. The Shipyard's pumping system "causes groundwater from the coke oven area [at the Steel Mill Property] to flow towards the dock and thereby to cause contaminated groundwater from the coke oven area to flow to the graving dock." [Shanahan Dep., ECF No. 103-39, Ex. 37, p. 139–40]. The discharge of the water from the underdrain pumps to the Patapsco River is regulated by the Clean Water Act; specifically, it is regulated by a National Pollutant Discharge Elimination System ("NPDES") discharge permit issued by the Maryland Department of the Environment ("MDE"). [ECF No. 105, p. 4]. When SPS LLLP first acquired the Shipyard in 2004, there was a pre-existing NPDES permit in effect; this permit was renewed and transferred to BWI in 2006. [ECF No. 105, p. 4].

Because of sampling performed by MDE in 2005, which detected high levels of benzene in the discharge, the 2006 renewal included a new discharge limit of 0.51 mg/l on benzene in certain graving dock discharges. [ECF No. 105, p. 4]. This 0.51 mg/l limit applied, however, only to "dewatering/trim pumps," and not to the "underdrain pumping system." [ECF No. 105, p. 4; ECF No. 112, p. 3]. MDE eventually realized that benzene discharge data was not being collected from the underdrain pumps, and had discussions in 2007 with the Shipyard about the issue. [ECF No. 105, p. 4]. Eventually, in January 2009, MDE revised its permit to impose the same 0.51 mg/l limit to the underdrain pump discharge, and this revision was to go in effect in February 2010. [ECF No. 105, p. 4-5]. A fact sheet that accompanied the modification noted that: "Groundwater at the site is contaminated with benzene from coke making operations that took place at the adjacent steel mill. Because the steel mill is not taking steps to contain the contamination plume, this groundwater enters the underdrain system associated with the graving

4

dock."[1] [ECF No. 112, p. 3]. To comply with this new benzene limitation, the Shipyard Plaintiffs installed a benzene treatment system that removes benzene from the groundwater. [ECF No. 112, p. 4]. Since 2012, Plaintiffs allege to have incurred over $1 million in costs to BWI for its operations and maintenance of the benzene treatment system. [ECF No. 112, p. 5].

The Shipyard Plaintiffs instituted this action by filing a Complaint on February 28, 2014. [ECF No. 1]. They filed an Amended Complaint on May 21, 2014 [ECF No. 7], and a Second Amended Complaint ("SAC") on January 15, 2015. [ECF No. 35]. The Shipyard Plaintiffs' SAC alleges: (1) recovery of costs under CERCLA; (2) a declaratory judgment pursuant to CERCLA holding defendants liable for their share of all response costs; (3) negligence; (4) trespass; (5) nuisance; and (6) strict liability. [ECF No. 35]. The Steel Mill Defendants later filed counterclaims pursuant to CERCLA and Maryland law against the Shipyard Plaintiffs. [ECF No. 52 & 61]. The Steel Mill Defendants filed a Motion to Dismiss for Failure to State a Claim [ECF No. 42], which this court denied on August 7, 2015. [ECF No. 69]. The Steel Mill Defendants filed the instant Motion for Summary Judgment on April 7, 2017. [ECF No. 103]. In response, the Shipyard Plaintiffs filed a Counter-Motion for Summary Judgment on May 9, 2017. [ECF No. 111]. TPA also filed a separate Motion for Summary Judgment on the sole issue of its status as a Bona Fide Prospective Purchaser on April 7, 2017. [ECF No. 107]. The Steel Mill Defendants filed a Motion to Strike the affidavit of Dr. Peter Shanahan on July 13, 2017. [ECF No. 128]. All motions are fully briefed.

## STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

---

[1] This was before Sparrows Point's 2012 purchase of the property.

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme

Court has clarified this does not mean that any factual dispute will defeat the motion. "By its

very terms, this standard provides that the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A genuine issue of

material fact exists where, "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Id.* at 247. The party seeking summary judgment bears the initial burden

of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club,*

*Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

Indeed, the party opposing summary judgment must "do more than simply show that there is

some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*

Corp., 475 U.S. 574, 586 (1986); *see also In re Apex Express* Corp., 190 F.3d 624, 633 (4th

Cir.1999). The court must "view the evidence in the light most favorable to . . . the nonmovant,

and draw all reasonable inferences in her favor without weighing the evidence or assessing the

witnesses' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir.

2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent

factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526

(internal quotations omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## ANALYSIS

The Shipyard Plaintiffs' SAC alleges: (1) recovery of costs pursuant to CERCLA; (2) a declaratory judgment holding defendants liable for their share of all response costs pursuant to CERCLA; (3) negligence; (4) trespass; (5) nuisance; and (6) strict liability. [ECF No. 35]. After addressing two preliminary issues, I assess these claims in turn. I then assess TPA's argument that it should be accorded protection as a *bona fide* prospective purchaser, and the Steel Mill Defendants' counterclaims.

### I.   **Preliminary issues**

#### *A. Standing*

As a threshold matter, the Steel Mill Defendants argue that the Shipyard plaintiffs cannot bring their claims due to lack of standing. To establish standing, the Shipyard Plaintiffs "must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Matherly v. Andrews*, 859 F.3d 264, 277 (4th Cir. 2017). A plaintiff may only recover damages that are "reasonably certain" and not "based on speculative, remote or uncertain figures." *Dierker v. Eagle Nat'l Bank*, 888 F. Supp. 2d 645, 658 (D. Md. 2012).

The Steel Mill Defendants argue that the Shipyard Plaintiffs are precluded from recovery because "they have failed to demonstrate that they actually incurred any damages." [ECF No. 105, p. 11]. Specifically, they argue that because BWI "operates both the graving dock and the wastewater treatment system at the Shipyard," and "BWI is a separate and independent entity from Plaintiffs," the Shipyard Plaintiffs are barred from bringing these claims. *Id.* They further

7

argue that because BWI has, *inter alia*, "incurred any and all alleged costs," the Shipyard Plaintiffs cannot establish an "injury in fact." *Id.* at 10. As they contend, the alleged damages amount to "nothing more than vague and ambiguous statements concerning cash flow," and that the Shipyard Plaintiffs "have not produced any documents in this litigation reflecting the date, amount, or purpose for [the] alleged transfers between" the Plaintiffs and BWI. *Id.* at 11.

The Shipyard Plaintiffs, however, argue that although BWI is responsible for managing the benzene treatment system, they "reimburse" BWI at the end of each year. [ECF No. 112, p. 36]. Specifically, the Shipyard Plaintiffs cite to a "General Ledger" in their counter-motion that seems to depict the following payments to BWI for operations and maintenance ("O&M") costs related to the benzene system: $254,435.01 (2016), $222,597.81 (2015), $380,198.16 (2014), $292,906.45 (2013) and $291,002.37 (2012). *Id.* As a result, the Shipyard Plaintiffs believe they have alleged a "perfectly concrete, non-speculative injury for which Plaintiffs are entitled to recover." *Id.*

First, the court finds that Shipyard Plaintiffs have not sufficiently explained or clarified the costs associated with benzene treatment. For example, in their cross-motion, they allege costs associated with benzene treatment in 2014 as $380,198.16. *Id.* However, while the General Ledger reveals a debit of $380,198.16 associated with "benzene," there is also a credit in 2014 of $283,382.10 associated with "benzene." [ECF 112-1, p. 4]. Similarly, in 2013, while there is a debit of $292,906.45 associated with "benzene," there is also a credit of $234,984.56 associated with "benzene." While the Shipyard Plaintiffs mention these debits in their cross-motion, they never even mention the credits. Thus, the court is uncertain whether the "$1.2 million [in payments to BWI alleged] between the years 2012 to 2016," is an accurate figure or not; the Shipyard Plaintiffs have not provided sufficient information. While the Steel Mill Defendants'

8

arguments have merit, the Shipyard Plaintiffs have likely incurred some costs. Ultimately, the court opts to deny granting summary judgment in defendants' favor on this basis; instead, they are entitled to summary judgment on the merits as discussed, *infra.*

### B. *Illegality*

Maryland courts generally refuse to extend aid to parties that engage in immoral or illegal transactions. *See, e.g.*, *United Elec. Supply Co. v. Greencastle Gardens Section III Ltd. Partnership*, 373 A.2d 42, 48 (Md. 1977) (precluding recovery for non-delivery where the sale itself was illegal); *see also Parker v. Moore*, 115 F. 799, 805 (4th Cir. 1902) (holding that the court will not lend aid to one who founds his cause of action upon an immoral or illegal act). The Steel Mill Defendants argue that the Shipyard Plaintiffs' claims are barred due to illegality because "a permit is required to appropriate surface or groundwater, when using more than 10,000 gallons per day," and "neither BWI nor Plaintiffs has a water appropriation permit."[2] [ECF No. 105, p. 2]. The Shipyard Plaintiffs counter that they are not "using or appropriating groundwater, but are merely pumping it from the graving dock to the Patapsco River, its natural end point." [ECF No. 112, p. 34]. Moreover, the Shipyard Plaintiffs are operating under a NPDES discharge permit issued by MDE, and MDE has not "required a water appropriations permit," despite being "aware of the discharge at the graving dock." *Id.* at 34-25.

Not only is in unclear whether the Shipyard Plaintiffs would actually need a groundwater appropriation permit, the court finds this is not the type of "illegal or immoral transaction" contemplated by the cases cited by the Steel Mill Defendants. Accordingly, the court rejects the Steel Mill Defendants' illegality argument.

II.    **CERCLA**

---

[2] The underdrain system pumps "roughly 1.08 million gallons per day." [ECF No. 105, p. 2].

Counts One and Two of the SAC assert claims for cost recovery and declaratory judgment pursuant to CERCLA (the "Comprehensive Environmental Responsibility, Compensation and Liability Act"). Congress enacted CERCLA "in response to the serious environmental and health risks posed by industrial pollution . . . [and the] Act was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *SPS Ltd. P'ship, LLLP v. Severstal Sparrows Point, LLC*, 808 F. Supp. 2d 794, 800 (D. Md. 2011) *abrogated by SPS Ltd. P'ship, LLLP v. Sparrows Point, LLC*, 122 F. Supp. 3d 239 (D. Md. 2015) (quoting *Burlington N. & Santa Fe Ry. v. United States*, 556 U.S. 599, (2009)). "By permitting private individuals to recover specified costs of cleanup from those parties responsible for environmental hazards, CERCLA encourages private individuals to remediate those hazards." *Id.* (quoting *Westfarm Assocs. Ltd. P'shp. v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 677 (4th Cir. 1995)).

The Steel Mill Defendants and the Shipyard Plaintiffs make various arguments as to why they are each entitled to summary judgment on these two counts. For the reasons discussed below, I agree with the Steel Mill Defendants.

### A. Section 363(f) and the Asset Purchase Agreement ("APA")

Section 363(f) grants a Bankruptcy Court authority to approve the transfer of assets "free and clear" of liabilities, including the elimination of liability for off-site contamination.[3] 11 U.S.C. § 363(f). A purchaser of assets via a Section 363 sale can take those assets free and clear of successor liability, including liability relating to environmental claims of the seller. *See Severstal Sparrows Point, LLC v. U.S. E.P.A.*, 794 F. Supp. 2d 624, 631 (D. Md. 2011) ("This

---

[3] The "off-site contamination" at issue here is the contamination at the Shipyard.

order was authorized by a Section 363 sale under the Bankruptcy Code, 11 U.S.C. § 363, and eliminates Severstal's liability for toxic discharge that occurred prior to the date of the order's issuance."); *SPS,* 808 F. Supp. 2d at 803 ("[T]he Bankruptcy Sale Order entered by the United States Bankruptcy Court for the Southern District of New York on April 23, 2003 relieves defendants of liability for the release or migration of hazardous waste and hazardous constituents occurring before April 23, 2003.").

Here, defendant Sparrows Point purchased the Steel Mill Property out of the bankruptcy proceeding of the former owner, RG Steel. The purchase was pursuant to an Asset Purchase Agreement ("APA") that was approved by the U.S. Bankruptcy Court. [ECF No. 119, Ex. 17]. The APA explicitly limited the scope of Sparrows Point's liability for existing contamination; while Sparrows Point assumed environmental liabilities at the Steel Mill Property, it did not assume liabilities for contamination that was not on the Steel Mill Property. Indeed, Section 1.4(d) of the APA excludes "all Liabilities related to or associated with offsite issues, third party bodily or property claims or Natural Resource Damages of Seller (and its predecessors-in-interest or title)." [ECF No. 119, Ex. 17 at § 1.4(d)]. Furthermore, the Bankruptcy Court made a finding that:

> O. Purchaser would not have entered into the Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates, and their creditors, *if the sale of the Purchased Assets to Purchase was not free and clear of all Interests of any kind or nature whatsoever*, or if Purchaser would, or in the future could, be liable for any of the Excluded Liabilities (as defined in the Agreement).

[ECF No. 119, Ex. 17 at ¶ O (emphasis added)]. The Bankruptcy Court Sale Order also prohibits and enjoins anyone from pursuing claims against the purchaser arising out of the purchased assets or the prior operations of RG Steel. *Id.* at ¶ 10.

11

The Shipyard Plaintiffs largely ignore the effect of the APA approved by the Bankruptcy Court in their briefing. They also ignore Paragraph 10 of the Sale Order, which prohibits and enjoins them from pursuing claims against the Steel Mill Defendants. Accordingly, the court finds that the Steel Mill Defendants are not liable for any benzene that migrated off the Steel Mill Property *prior* to its September 2012 purchase of the property.

### B.  42 U.S.C. § 9607(a)

42 U.S.C. § 9607(a) defines who can be held liable under CERCLA. These entities are commonly referred to as potentially responsible parties ("PRPs"). The statute states that, *inter alia*, the "the owner and operator of a vessel or a facility" or "any person who *at the time of disposal of any hazardous substance* owned or operated any facility at which such hazardous substances were disposed of" can be held liable. *Id.* at § 9607(a)(1–2) (emphasis added). PRPs within these categories are potentially liable for "necessary costs of response" incurred by a non-governmental party such as the Shipyard Plaintiffs, but only to the extent such costs are "consistent with the National Contingency Plan." *Id.* at § 9607(a)(4)(B).

Defendant Sparrows Point argues that it is not the current "owner and operator" of the Steel Mill Property, and therefore it can only be held liable if there was a "disposal" of any hazardous substance while it was the owner of the Steel Mill Property. The Shipyard Plaintiffs argue that Sparrows Point *was* the current owner when the complaint was filed, and only became a former owner when Sparrows Point sold the property to TPA. The Shipyard Plaintiffs argue that this sale was the basis for the second amendment to the complaint, and this sale cannot permit Sparrows Point to avoid liability as a current owner. Accordingly, they argue that Sparrows Point is strictly liable as a "current owner" "without regard to causation."

12

I find that while the Shipyard Plaintiffs' argument that Sparrows Point should be considered a "current owner" within the context of § 9607(a)(1) has some merit, their conclusions are incorrect. First, it is undisputed that the benzene contamination is the result of the coke oven operations that were discontinued *prior* to Sparrows Point's acquisition of the Steel Mill Property pursuant to the APA in 2012. Second, I have already decided that the Steel Mill Defendants are not liable for benzene that migrated off the Steel Mill Property *prior* to the September 2012 purchase. *See supra*, Section II(A). Accordingly, while Sparrows Point might have been considered a "current owner" had it not acquired the property through a Section 363 sale, the Shipyard Plaintiffs are incorrect to argue that Sparrows Point is strictly liable for *any* benzene migration "without regard to causation." [ECF No. 112, p. 8]. Rather, Sparrows Point can be held strictly liable to the extent there was some "disposal of [benzene]" while they "owned or operated" the Steel Mill Property. 42 U.S.C. § 9607(a)(2); *see also Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 846 (4th Cir. 1992) ("The trigger to liability under § 9607(a)(2) is ownership or operation of a facility at the time of disposal, not culpability or responsibility for the contamination.").

Accordingly, the question is whether there was a "disposal" of benzene during the relevant time period. CERCLA defines "disposal" for purposes of § 9607(a)(2) with reference to 42 U.S.C. § 9601(29), which in turn defines "disposal" as follows:

> The term "disposal" means the *discharge, deposit, injection, dumping, spilling, leaking, or placing* of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3) (emphasis added). The Fourth Circuit has examined the term "disposal," finding that it includes not just "active" conduct, but also "passive" conduct. *See Westfarm*

*Assocs. Ltd. P'ship v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 680 (4th Cir. 1995) ("The plain meaning of the statute supports the *Nurad* reading; 'leaking,' 'leaching,' and 'escaping' are all words which imply passive conduct."); *see also Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837 (4th Cir. 1992) (finding that 2 U.S.C. § 9607(a)(2) imposes liability for passive, in addition to active, involvement). Here, there was no "active" conduct regarding the benzene contamination attributable to the defendants. Rather, the benzene—a byproduct of coke oven operations that ceased many years ago—was already in the environment and merely migrating via the "passive" flow of groundwater. It should be noted that the "passive" flow of groundwater to the graving dock was enhanced by the Shipyard Plaintiffs' own pumping operations; indeed, according to the Shipyard Plaintiffs' own expert, Dr. Peter Shanahan, it is "unsurprising" that the Shipyard Plaintiffs' pumping activities "cause contaminated groundwater from the coke oven area to flow to the graving dock." [ECF No. 103-39, Ex. 37, p. 139-40]. The question, therefore, becomes whether this type of "passive" movement of benzene constitutes a "disposal."

In *Nurad*, the Fourth Circuit examined claims against the previous owners of a property, evaluating whether a "disposal" had occurred. *Id.* There, the previous company abandoned underground storage tanks that were leaking hazardous waste at a site, later selling the property, including the tanks, to a purchaser who had no use for the tanks. *Id.* The Fourth Circuit first determined that § 9607(a)(2) imposes liability not just for "active involvement in the 'dumping' or 'placing' of hazardous waste at the facility," but also for more "passive" involvement such as owning a facility during the time hazardous waste was "spilling" or "leaking." *Id.* at 846. Next, the Fourth Circuit concluded there had been a "disposal," finding that "[a] defendant who has

14

abandoned hazardous materials at a site cannot escape CERCLA liability by simply labelling a subsequent transfer of the property as a 'sale' of the hazardous waste." *Id.* at 847.

In a subsequent case, the Fourth Circuit extended similar logic to a dispute where the plaintiff was seeking recovery costs for hazardous substances leaking from a sewer system, which subsequently migrated to plaintiff's property. *Westfarm Assocs. Ltd. P'ship v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669 (4th Cir. 1995). There, defendant WSSC did not cause the original leak of contaminants, but instead managed a sewer system and allowed contaminants to leak into the plaintiff's property by failing to properly maintain its sewage pipes. *Id.* at 674-75. Ultimately, the court concluded that the movement of contaminants through cracks in sewage piping was a "disposal," in part because the defendant's "failure to maintain its pipes in good condition earned it some *responsibility* for the contamination." *Id.* at 681 (emphasis added).

Although the type of contamination at issue is a "passive" one, this case is not like *Nurad*, where the defendant was itself responsible for the hazardous materials that leaked into the environment. It is also not like *Westfarm*, where the defendant had some responsibility for the contamination because it failed to properly maintain its sewage piping. Here, it is undisputed that the benzene was released prior to Sparrows Point's 2012 purchase. Indeed, the evidence reveals the coke ovens and the byproduct recovery operations responsible for the benzene contamination "stopped operating in the [1980's]" [ECF No. 105, p. 14-15 & Ex. 8], and that the ovens had been demolished prior to Sparrows Point's 2012 purchase. *Id.* at p. 14.

Instead, this case is more akin to cases that address the passive flow of contaminants through groundwater. In such cases, courts have generally found that previous owners are not liable under CERCLA if they were not responsible, in some manner, for the contamination. *See Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 879, 887 (9th Cir. 2001) (finding that

15

the "gradual passive migration of contamination through the soil that allegedly took place" during defendants' period of ownership was "not a 'disposal' under § 9607(a)(2)"); *see also ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 358-59 (2d Cir. 1997) (finding that "prior owners and operators of a site [were] not liable under CERCLA" for hazardous chemicals that "continued to gradually spread underground (passive migration)").

Ultimately, as the Fourth Circuit quoted in *Westfarm*, CERCLA "imposes the costs of cleanup on those *responsible* for the contamination." *Westfarm*, 66 F.3d at 681 (quoting *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 7 (1989) *overruled by Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996) (emphasis added). While responsibility is not purely limited to the party responsible for the original contamination, it is undisputed that the original benzene contamination at issue occurred prior to Sparrows Point's purchase, and that Sparrows Point had no hand in that contamination. It is also undisputed that the contamination at issue is merely the passive flow of benzene through groundwater, which is undoubtedly assisted by the Shipyard Plaintiffs' own activites. [ECF No. 112, p. 2]. Consistent with Fourth Circuit decisions in *Nurad* and *Westfarm*, as well as case law from other circuits, I find there has been no "disposal" here in the context of 42 U.S.C. § 9607(a).

### C. *"Necessary cost of response" under 42 U.S.C. § 9607(a)(4)*

"If PRP status is established, a party faces liability under CERCLA for . . . 'any other *necessary costs of response* incurred by any other person consistent with the national contingency plan.'" *Consolidation Coal Co. v. Georgia Power Co.*, 781 F.3d 129, 143 (4th Cir. 2015) (quoting 42 U.S.C. § 9607(a)(4)(b))(emphasis added). In this context, CERCLA "provides that 'response' or 'respond' 'means remove, removal, remedy, and remedial action' and that 'all such terms (including the terms 'removal' and 'remedial action') include

16

enforcement activities related thereto.'" *Key Tronic Corp. v. United States*, 511 U.S. 809, 813 (1994) (quoting 42 U.S.C. § 9601(25)). The Steel Mill Defendants argue that there is no "necessary cost of response" because the Shipyard Plaintiffs' activities were not undertaken to clean up the environment, but were instead "incurred solely as a component of Plaintiffs' business activities." [ECF No. 119, p. 15; ECF No. 105, p. 19-21]. The Shipyard Plaintiffs counter that their costs were "necessary" because they were incurred in order to comply with a State-imposed limit on benzene, which would cause "a threat to human health and the environment" if not removed from the groundwater. [ECF No. 112, p. 12].

"As the language of the statute implies, whether the costs were 'necessary' is a threshold issue for recovery[.]" *Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006) (citing 42 U.S.C. § 9607(a)(4)(B)). The "CERCLA recovery provision is not a wholesale cost-shifting mechanism." *See 500 Assocs., Inc. v. Vermont Am. Corp.*, 768 F. Supp. 2d 914, 920 (W.D. Ky. 2011) (citing *Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006)). Costs are "'necessary' if incurred in response to a threat to human health or the environment." *Reg'l Airport*, 460 F.3d at 703. Indeed, as the Fourth Circuit has noted, "Congress in enacting CERCLA clearly manifested intent not to provide compensation for economic losses." *Braswell Shipyards, Inc. v. Beazer E., Inc.*, 2 F.3d 1331, 1337, n. 5 (4th Cir. 1993) (quoting *Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. 1269, 1285–86 (D. Del. 1987)). The "legislative history makes clear that 'Congress . . . intended to provide a vehicle for cleaning up and preserving the environment from the evils of improperly disposed of hazardous substances *rather than a new font of law on which private parties could base claims for personal and property injuries.*" *Id.* (quoting *Artesian Water Co. v. Gov't of New Castle Cty.*, 605 F. Supp. 1348, 1356 (D. Del. 1985)) (emphasis added).

In contrast, costs incurred "for other business reasons," costs that do not increase "the probability that a cleanup would be effective," or costs that are incurred "at a time when the plaintiff was unaware of any threat to human health or the environment," are generally unrecoverable because they are not "necessary." *See, e.g., Key Tronic Corp. v. United States*, 511 U.S. 809, 820 (1994) (finding that certain legal expenses that were not "closely tied to the actual cleanup," and that did not increase "the probability that a cleanup would be effective," did not constitute "necessary costs of response"); *see also Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 705 (6th Cir. 2006) (finding that an alleged response cost was not "necessary" because "the response costs and the runway construction costs were one and the same," and therefore "allowing the [Plaintiff] to recoup its 'response costs' would be tantamount to a reimbursement of its runway construction costs."); *500 Assocs.*, 768 F. Supp. 2d at 921 (finding that plaintiff "cannot recover its costs under § 9607 because the costs cannot be shown to have furthered the cleanup of the property," and were instead "incurred for [plaintiffs'] own business purposes").

Here, it is undisputed that the Shipyard Plaintiffs' costs associated with treating the graving dock discharge were incurred for business purposes, and not for purposes of cleaning up the environment. In other words, although the Shipyard Plaintiffs operated the water treatment system to remain within the 0.51 mg/l benzene limit imposed by MDE, the need for this treatment was caused by its operation of the graving dock. Indeed, the Shipyard Plaintiffs seek contribution for their underdrain pump systems that pumped an "average rate of 750 gallons per minute (i.e. roughly 1.08 million gallons per day)." [ECF No. 105, p. 11]. The Shipyard Plaintiffs' corporate designee even confirmed that their "purpose was not to treat or contain the benzene plume for the adjacent property," but rather "to be able to discharge under [their]

18

NPDES permit." [ECF no. 105, EX 8, p. 146-47]. Moreover, the facts show that there is no environmental contamination issue at the Shipyard Site that necessitates a "remedial action"; rather it is the operation of the graving dock that forces the Shipyard Plaintiffs to operate their treatment system. [ECF No. 105, p. 23; ECF No. 112, n. 2; ECF no. 119, p. 15].

The Shipyard Plaintiffs counter that their motives for cleaning up the benzene—whether environmental or business in nature—are irrelevant to their right to recover under CERCLA. [ECF No. 112, p. 12]. For this assertion, the Shipyard Plaintiffs cite *to Channel Master Satellite Sys., Inc. v. JFD Elecs. Corp.*, and *BCW Assocs., Ltd. v. Occidental Chem. Corp.*, where the respective courts stated that the motive for cleaning up a site is not of import. *See Channel Master*,748 F. Supp. 373, 379 (E.D.N.C. 1990) (stating that the plaintiff's "motives for cleaning up the Oxford site have no bearing on its right to recover response costs under CERCLA"); *BCW Assocs.*, 1988 WL 102641, at *17 (E.D. Pa. 1988) ("Whether [plaintiff] was initially motivated by business or by environmental concerns in responding to this threatened release is not relevant to the causation inquiry."). However, the Shipyard Plaintiffs' argument is incorrect. As the Steel Mill Defendants point out, both of these cases involved "an actual cleanup, in situations where cleaning up the environment was necessary, and where the actions taken were necessary toward achieving that goal." [ECF No. 119, p. 16]. Instead, the facts of this case are more akin to *U.S. v. Reuland Elec. Co.*, where the U.S. District Court for the Central District of California found that a Water Company's need to install facilities to treat contaminated water was not a "response cost." 793 F. Supp. 2d 1131 (C.D. Cal. 2011). Although the Water Company there "installed [treatment] systems so it could continue to provide safe drinking water to its customers," the court found this was not a "removal within the meaning of CERCLA because it is not [a] cleanup or removal . . . *from the environment*," nor a "remedial action because it does

19

not prevent or minimize the release of hazardous substances so that they do not *migrate*." *Id.* at 1372 (emphasis in original). Accordingly, because the Water Company's actions were not a "removal" or "remedial" action, they were not a "response cost" under CERCLA.[4] *Id.* The same is true in the present case. For the foregoing reasons, I find that the Shipyard Plaintiffs' alleged costs were not "necessary costs of response" under 42 U.S.C. § 9607(a)(4).

Ultimately, for the reasons discussed in Section II(A–C), the Steel Mill Defendants are entitled to summary judgment on Counts I and II.

## III.    **State Law Claims**

The Shipyard Plaintiffs also allege various theories for recovery under Maryland law in their SAC, including: (a) negligence; (b) trespass; (c) nuisance; and (d) strict liability. [ECF No. 35]. As an initial matter, as discussed *supra*, the Shipyard Plaintiffs largely disregard the effect of the Asset Purchase Agreement ("APA") that was approved by the U.S. Bankruptcy Court, including Paragraph 10 of the Sale Order, as it relates to any liabilities *prior* to 2012. In addition to this, the Steel Mill Defendants are entitled to summary judgment on these counts for the reasons discussed, *infra*.

### *A. Negligence*

Count III of the Shipyard Plaintiffs' SAC alleges a claim for negligence. [ECF no. 35, p. 13]. "To establish a negligence claim, a plaintiff must allege facts showing that: (1) the defendant owes the plaintiff a duty of care; (2) the defendant breached that duty; (3) the plaintiff sustained an injury or loss; and (4) the defendant's breach of the duty was the proximate cause of

---

[4] I note here that the Plaintiffs "respectfully disagree" with the *Reuland* court's conclusions, and they point out that "no other case has cited *Reuland Electric*," and therefore the "case should not be considered persuasive authority in this proceeding." [ECF No. 125, p. 11-12]. Plaintiffs' arguments were taken in consideration. Accordingly, while *Reuland* does not factor heavily in my analysis or conclusions, I still choose to cite to it because I find it similar to the present case and well-reasoned.

20

the plaintiff's injury." *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 155 A.3d 445, 451 (Md. 2017). The Steel Mill Defendants are entitled to summary judgment on this count.

First, it is somewhat unclear what exact duty is owed by the Steel Mill Defendants to the Shipyard Plaintiffs, and what the alleged breach of that duty is. The Shipyard Plaintiffs cite to *Exxon Corp. v. Yarema*, for the proposition that "Defendants had a duty to contain hazardous substances located beneath the surface of the Steel Mill Site and to prevent the ongoing migration of pollutants to Plaintiffs' property." 516 A.2d 990, 1005 (Md. Ct. Spec. App. 1986). However, in that case, the original defendant Exxon Corporation was *itself responsible* for the contamination at issue. *Id.* at 132. There, Exxon's failure to respond to several leaks of unleaded gasoline into Baltimore County was found to be a breach of its duty to residents. *Id.* Here, it is undisputed that the Steel Mill Defendants were not the responsible for the benzene contamination; rather, they purchased the property—subject to the APA approved by the Bankruptcy Court—after the coke oven operations had ceased. Accordingly, this case is not like *Exxon Corp. v. Yarema* cited by the Shipyard Plaintiffs. I further note that accepting the Shipyard Plaintiffs' argument would essentially impose a *res ipsa loquitur*-like liability on any subsequent owner, provided some benzene remain in the groundwater.

Next, the parties disagree over whether the Shipyard Plaintiffs must provide expert testimony to support the elements of its negligence claim; the Steel Mill Defendants argue that expert testimony is needed, while the Shipyard Plaintiffs counter that it is not. "Expert testimony is required when the subject matter is so particularly related to some science or profession that it is beyond the ken of the average layman." *Adams v. NVR Homes, Inc.*, 142 F. Supp. 2d 649, 654 (D. Md. 2001) (summary judgment granted after expert testimony was excluded, on basis that

21

expert testimony was critical because the complaint was "so particularly related to professional engineering that it [was] beyond the ken of the average juror"). For example, in an environmental clean-up case alleging gross negligence, the Fourth Circuit affirmed the grant of summary judgment for defendant, because the plaintiff failed to provide "evidence of normal industry standards or any expert testimony relevant to Exxon's actual clean-up efforts." 15 F.3d 327at 333 (4th Cir. 1994). The Shipyard Plaintiffs argue that whether the Steel Mill Defendants breached a duty to them is not one that necessitates expert testimony, because it is a "straightforward legal determination." [ECF No. 112, p. 24]. I disagree. Specifically, the Plaintiffs should have provided some testimony regarding the alleged negligence of the Steel Mill Defendants. This should have included, *inter alia*, whether sufficient quantities of benzene migrated from the Steel Mill Property to the graving dock during ownership of the Steel Mill Defendants.[5] Although the Shipyard Plaintiffs' allegations were sufficient at the motion to dismiss stage, they are insufficient here.

Third, I find that the plaintiffs assumed the risk of benzene contamination through their pumping activities. "[I]t is well settled that in order to establish the defense of assumption of risk, the defendant must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." *Poole v. Coakley & Williams Const., Inc.*, 31 A. 3d 212, 224 (Md. 2011). The Shipyard Plaintiffs contend that they "did not have full knowledge or appreciation of the benzene contamination" and that "nobody understood that the operation of the graving dock was resulting in the discharge of benzene." [ECF No. 112, p. 28]. However, such a contention ignores the undisputed facts; indeed, I

---

[5] The Shipyard Plaintiffs belatedly introduced some such evidence in their surreply. [ECF No. 105]. This evidence is the subject of a motion to strike, which as discussed *infra*, is denied. Although I considered the belatedly-introduced evidence of Dr. Shanahan, it does not overcome the other deficiencies discussed in this section.

previously found that the Shipyard plaintiffs had, at minimum, inquiry notice of the benzene contamination as of February 22, 2004, if not actual notice. *SPS Ltd. P'ship, LLLP v. Severstal Sparrows Point, LLC*, 808 F. Supp. 2d 794, 814 (D. Md. 2011) ("Plaintiffs may well have had actual notice of contamination when they submitted the application to Maryland's VCP on February 22, 2004, but I find they certainly had inquiry notice."). Moreover, the Shipyard Plaintiffs' activities—namely pumping water to operate the graving dock—caused contaminated groundwater from the coke oven area to flow toward the graving dock. Ultimately, while plaintiffs are within their rights to continue their graving dock operations, they do so voluntarily and with full knowledge of the danger of benzene contamination.

For the aforementioned reasons, the Steel Mill Defendants are entitled to summary judgment on the negligence count.

### B. Trespass

Under Maryland law, "[w]hen a defendant interferes with a plaintiff's interest in the exclusive possession of the land by entering or causing something to enter the land, a trespass occurs." *Rosenblatt v. Exxon Co., U.S.A.*, 642 A.2d 180, 189 (Md. 1994) (citing *Rockland, Inc. v. H. J. Williams*, 219 A.2d 48 (Md. Ct. App. 1965)). The Steel Mill Defendants cite to *JBG/Twinbrook Metro Ltd.Partnership v. Wheeler* for the proposition that "the defendant must have some connection with or some control over [the] object," here benzene. 697 A.2d 898, 909 (Md. 1997). Plaintiffs counter, however, that "benzene is continuously migrating off the Steel Mill Site," "discharges are part of an ongoing trespass and single harm that cannot be readily apportioned, and thus [defendants] can be held jointly and severally liable." [ECF No. 112, p. 21]. For this assertion, the Shipyard Plaintiffs cite to a CERCLA case, *United States v. Monsanto*, which only addresses CERCLA and *does not address Maryland causes of action*,

such as trespass, nuisance, and negligence. 858 F.2d 160 (4th Cir. 1988). Here, I find Shipyard Plaintiffs have not met their burden at the summary judgment stage to establish the Steel Mill Defendants controlled the benzene so as to impose liability for trespass. Accordingly, the Steel Mill Defendants are entitled to summary judgment on this count.

### C. Private nuisance

The Shipyard Plaintiffs allege a claim of private nuisance in Count V against the Shipyard Defendants. A private nuisance is "a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Mitchell v. WSG Bay Hills IV, LLC*, No. CIV.A. RDB-12-2036, 2013 WL 6502875, at *5 (D. Md. Dec. 11, 2013) (quoting *Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 94 (Md. 2013)). "To succeed on a nuisance claim, a plaintiff must establish an unreasonable and substantial interference with his or her use and enjoyment of his or her property, such that the injury is 'of such character as to diminish materially the value of the property as a dwelling . . . and seriously interfere with the ordinary comfort and enjoyment of it.'" *Id.* (quoting *Exxon*, 71 A.3d at 94). "Not every interference with a plaintiff's enjoyment and use of land, however, will support a cause of action for nuisance." *Id.* (quoting *Exxon*, 71 A.3d at 94.

As an initial matter, the Steel Mill Defendants ask the court to apply an assumption of the risk defense to the Shipyard Plaintiffs' nuisance claim, arguing that Maryland courts have not held that the defense cannot apply to a nuisance claim. [ECF No. 105, p. 47]. However, I decline to apply this defense here; while no Maryland court has stated the defense does not apply, neither party has been able to identify a case stating it does. Furthermore, in at least one Maryland case, a court elected not to submit the "assumption of risk defense" to the jury on a nuisance count. *JBG/Twinbrook Metro Ltd. P'ship v. Wheeler*, 697 A.2d 898, 903 (Md. 1997).

Instead, I again note the issues discussed *supra.* The Shipyard Plaintiffs' voluntary activities contributed to the benzene contamination by drawing benzene to their property. The Shipyard Plaintiffs should not be permitted to hold the Steel Mill Defendants liable for private nuisance when they themselves contribute to any alleged "substantial interference with [their] use and enjoyment." Moreover, the interference must be an "unreasonable" one. Any argument suggesting that the passive flow of benzene through groundwater is now "unreasonable," ignores the fact that the Shipyard Plaintiffs were on, at minimum, inquiry notice of the benzene contamination in 2004—nearly eight years before the Steel Mill Defendants' purchase of the Steel Mill Property. Lastly, as discussed in the trespass section, *supra*, the Shipyard defendants do not have control over the benzene. For these reasons, the Steel Mill Defendants are entitled to summary judgment on this count.

### D. Strict Liability

Maryland courts have recognized that strict liability may be extended to defendants engaged in "abnormally dangerous activities." *Gallagher v. H.V. Pierhomes, LLC*, 957 A. 2d 628, 634 (Md. Ct. Spec. App. 2008) (quoting Restatement (Second) of Torts § 519, at 34 (1977)). The Shipyard Plaintiffs argue that the Steel Mill Defendants should be strictly liable because they "knowingly purchased a property contaminated with benzene which continues to leach into the groundwater and flow offsite." [ECF No. 112, p. 32]. Specifically, the Shipyard Plaintiffs argue that the Steel Mill Defendants are strictly liable because benzene is a known carcinogen, that the ongoing risk associated with benzene cannot be eliminated through reasonable care, and that there is no "value" to benzene. *Id.* This argument is without merit.

The Steel Mill Defendants are not "engaged" in "abnormally dangerous activities." *Gallagher*, 957 A. 2d at. 634. Rather, they are engaged in remediating and redeveloping a

property. Plaintiffs cite to no case suggesting this type of activity is an "abnormally dangerous activity." As the Steel Mill Defendants point out, the "practical application of Plaintiffs' argument would subject all purchasers of contaminated property to strict liability and would discourage any and all purchases made for the purpose of environmental cleanup and redevelopment." [ECF No. 119, p. 31]. Accordingly, the Steel Mill Defendants are entitled to summary judgment on this count.

IV.     **TPA's status as a bona fide purchaser**

In addition to the arguments discussed *supra*, Defendant TPA—which purchased the Steel Mill Property from Sparrows Point in 2014—argues that it should be shielded from CERCLA liability due to its status as a bona fide prospective purchaser ("BFPP"). "BFPP status exempts from CERCLA liability a party otherwise liable simply because it is 'considered to be an owner or operator of a facility' under 42 U.S.C. § 9607(a)(1)." *PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 179 (4th Cir. 2013) (quoting 42 U.S.C. § 9607(r)(1)). "To qualify for the exemption, a current owner or operator of a facility must have acquired the facility after January 11, 2002, must not impede the performance of a response action or natural resource restoration at the facility, and must establish eight criteria by a preponderance of the evidence." *Id.* at 179–80 (citing 42 U.S.C. §§ 9601(40)(A)-(H) & 9607(r)(1)) (internal quotations omitted).

The Shipyard Plaintiffs argue that Defendant TPA fails two of the eight requirements enumerated in 42 U.S.C. § 9601(40)(A) and 42 U.S.C. § 9601(40)(H):

> (A) Disposal prior to acquisition: All disposal of hazardous substances at the facility occurred before the person acquired the facility.
> . . .
> (H) No affiliation: The person is not—
>> (i) potentially liable, or affiliated with any other person that is potentially liable, for response costs at a facility through—

26

(I) any direct or indirect familial relationship; or
(II) any contractual, corporate, or financial relationship (other than a contractual, corporate, or financial relationship that is created by the instruments by which title to the facility is conveyed or financed or by a contract for the sale of goods or services); or
(ii) the result of a reorganization of a business entity that was potentially liable.

I first find the Shipyard Plaintiffs' argument that TPA fails 42 U.S.C. § 9601(40)(A) is without merit. They again argue that the passive migration of benzene through groundwater—that they themselves contributed to—constitutes a current "disposal," and therefore TPA fails 42 U.S.C. § 9601(40)(A). For the same reasons discussed in further detail, *supra*, I conclude this is not a "disposal." Accordingly, I find that TPA satisfies this requirement.

Next, the Shipyard Plaintiffs argue that TPA fails 42 U.S.C. § 9601(40)(H) by being allegedly "affiliated through a web of corporate relationships" with previous owners of the Steel Mill Property, including Sparrows Point. [ECF No. 114-1, p. 2, 9]. The Shipyard Plaintiffs argue that TPA and previous owners of the Steel Mill Property "formed a plan pursuant to which they would scrub the environmental liabilities from the Steel Mill Property." [ECF No. 114-1, p. 1-2]. Both parties cite to *Ashely II* from the U.S. District Court for the District of South Carolina, where the court stated: "in deciding which 'affiliations' are prohibited by CERCLA, courts should be guided by 'Congress's intent of preventing transactions structured to avoid liability.'" *Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.*, 791 F. Supp. 2d 431, 502 (D.S.C. 2011), *aff'd*, 714 F.3d 161 (4th Cir. 2013). There, the court found that Ashely was not responsible because, in part, there was "no allegation . . . that Ashely is the result of a reorganization of a business entity that was potentially liable." *Id.*

Here, given the undisputed facts, I find the Steel Mill Defendants are entitled to summary judgment on this issue. As an initial matter, the Shipyard Plaintiffs' arguments that TPA was

27

motivated by an intent to avoid liability ignores the undisputed fact that TPA entered into an "Administrative Consent Order with the Maryland Department of the Environment, and a Settlement Agreement with the United States Environmental Protection Agency" upon purchasing the property, and that it has fully complied with those obligations. [ECF No. 122, p. 6, ECF No. 107, Exs. 5 & 6]. Next, the Shipyard Plaintiffs' arguments based on TPA's "affiliation" with Sparrows Points fails, because they argue that "[Sparrows Point] is a PRP for purposes of Plaintiffs' CERCLA claims." [ECF NO. 114-1, p. 10]. However, as discussed *supra* in Section II, Sparrows Point is entitled to summary judgment on this issue. Third, the Shipyard Plaintiffs argue that TPA and Hilco are "affiliated" for the purpose of avoiding liability because "Hilco in part owns TPA." [ECF No. 10]. However, while a Hilco subsidiary does have an interest in TPA, it only owns a 15% stake. [ECF No. 107-1, p. 17]. Furthermore, Hilco's primary potential interest in the property pertains to certain "select above-grade assets" that another of its subsidiaries purchased from RG Steel. *Id.* Fourth, the Shipyard Plaintiffs' arguments regarding the Weaver Consulting Group ("Weaver") do not establish a genuine issue of material fact for trial. Plaintiffs argue that Weaver was hired to "limit the liability of the prospective [ultimate] purchaser" of the Steel Mill Property, which is contrary to CERCLA guidance. Plaintiffs specifically allege that Weaver assisted with developing an environmental site assessment ("ESA"), providing assistance with the Administrative Consent Order, and providing consulting to allow the buyer to take advantage of the BFPP defense. None of these activities, however, are improper or inappropriate; indeed, conducting an ESA is a recognized way of establishing "all appropriate inquiry" under 42 U.S.C. § 9601(40)(B), and there is nothing inherently wrong with seeking protection as a BFPP, and hiring an expert to assist with that process.

In sum, there is no genuine dispute as to the material facts, and I find that TPA is entitled to summary judgment on its status as a BFPP for the aforementioned reasons

## V.  Counterclaims

The Steel Mill Defendants also filed counterclaims against the Shipyard Plaintiffs pursuant to CERCLA and Maryland law. [ECF No. 52 & 61]. In granting summary judgment in favor of the Steel Mill Defendants on the Shipyard Plaintiffs' CERCLA claims, I have rendered the CERCLA counts in the counterclaims moot.[6] I also find the remaining negligence counterclaim, pled in the alternative, is moot. Accordingly, these counterclaims are denied as moot.

## CONCLUSION

For the aforementioned reasons, the Steel Mill Defendants' Motion for Summary Judgment [ECF No. 103] is granted, and the Shipyard Plaintiffs' Counter-Motion for Summary Judgment [ECF No. 111] is denied. TPA's Motion for Summary Judgment on the sole issue of its status as a bona fide prospective purchaser [ECF No. 107] is also granted, and the Steel Mill Defendants' Motion to Strike the affidavit of Dr. Peter Shanahan is denied as moot. [ECF No. 128].[7] A separate order follows.

---

[6] The amended counterclaims state: [Steel Mill Defendant] denies any liability under CERCLA. *In the event that [Steel Mill Defendant] is found liable under CERCLA*, Plaintiffs are liable for contribution to [Steel Mill Defendant] pursuant to CERCLA 42 U.S.C. § 9613[.]" [ECF No. 52, p. 3; ECF No. 61, p. 3 (emphasis added)]. Because I granted summary judgment in favor of the Steel Mill Defendants, these counts are moot. Accordingly, I also choose note to address the question of whether the Shipyard Plaintiffs are "innocent parties" pursuant to 42 U.S.C. § 9607(b)(3).

[7] I have reviewed the Motion to Strike the affidavit of Dr. Peter Shanahan [ECF No. 128], and the memoranda submitted in connection therewith. As an initial matter, I note the belated nature of the introduction of this affidavit. It was filed 18 months after the Steel Mill Defendants offered expert reports on this very issue, after the close of discovery, and after extensive summary judgment motion practice. Plaintiffs argue that the prejudice can be cured by allowing defendants to depose Dr. Shanahan, and that they were not on notice that benzene travel time

Date: _9/6/12_

J. Frederick Motz
United States District Judge

---

was a part of the Steel Mill Defendants' argument. [ECF No. 129]. Ultimately, I find that Dr. Shanahan's testimony has no material impact on my conclusions. Accordingly, I deny the motion to strike [ECF No. 128], after having considered his 9-page affidavit.